1
2
3
4
5
6
7
8

IN THE UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON - SEATTLE

9

UNITED STATES OF AMERICA,

10                                Plaintiff,

11

12          vs.

13   NATHAN HALL,

14                                Defendant.

15

16   **DEFENDANT'S MOTION FOR REDUCTION IN SENTENCE PURSUANT TO**
17   **18 U.S.C. §3582(c)(A)(1), AS AMENDED BY THE FIRST STEP ACT OF 2018**

18                            **INTRODUCTION**

19        Comes now Defendant, by and through his attorney Lennard A. Nahajski, and

20   requests the Court consider a reduction in sentence for the reasons hereinafter set forth.

21   The defendant pleaded guilty to conspiracy to distribute MDMA, 21 USC § 841(a)(1)(C), and

22   possession of a firearm, § 924(c)(1)(A) for an incident that occurred on March 11, 2013.

23   Mr. Hall was sentenced by this court to 84 months imprisonment followed by three years

24   of supervised release. The defendant is a Canadian citizen serving the remainder of his

25   sentence at C.I.  North Lake in Baldwin, Michigan.

26
27
28

)  NO.    CR 13-113 RSL
)
)
)
)  MOTION FOR REDUCTION OF
)  SENTENCE PURSUANT TO 18 USC §
)  3582(c)(A)(1)
)
)

MOTION FOR COMPASSIONATE RELEASE -- 1

THE
NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA  98004-4376
206-621-0500 fax: 206-400-7636

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Despite being eligible for a treaty transfer and release to serve the remainder of his sentence in Canada, the defendant's request for a treaty transfer was unexpectedly denied.  The Petitioner now has a projected release date of June 10, 2021 and is currently 43 years old.

Mr. Hall was diagnosed with COVID-19 on May 8, 2020, and has continued to suffer long term physical consequences from the infection.   Despite repeated attempts to obtain medical treatment, such treatment has not been provided by the Bureau of Prisons ("BOP").  With the resurgence of the COVID-19 pandemic and increased infection rates among BOP inmates, Mr. Hall is susceptible to reinfection and exacerbation of the ongoing symptoms.

In December 2018, Congress changed the law of "compassionate release" allowing inmates, and not just the BOP, to petition the courts for release when, *inter alia,* they have served two thirds of their imposed sentence, and have worsening age related ailments that are adversely affecting the execution of their sentence. The authors of the law determined that BOP had done an inadequate job of recognizing and treating such inmates, and that sentencing courts should have discretion to consider a defendant's specific predicament.

The Court may order 'compassionate release' for efficient medical treatment — even if BOP could and did offer good care — *See, United States v Evans*, 4-15-cr-015-KMH, March 13 2019, (S.D. Texas), *also, United States v DiMasi,* 220 F.Supp. 3D 173 (D.Mass. 2016).

## RELIEF REQUESTED

Mr. Hall request his sentence be reduced to time served, or alternatively that he be released to home confinement at his residence in Canada.

MOTION FOR COMPASSIONATE RELEASE -- 2

THE
NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA 98004-4376
206-621-0500 fax: 206-400-7636

1
2
3
4

## APPLICABLE LAW

5

For many years, 18 U.S.C. §3582(c)(1)(A) allowed district courts to reduce federal

6
7

prisoners' sentences for 'extraordinary and compelling reasons' – often referred to as

8

"compassionate release" ("CR") - but until December 21, 2018, such a reduction in

9

sentence was permitted only upon motion of the Director of the BOP.  The BOP has

10

however, never been generous with CR motions.  Quite the opposite: the BOP's stinting

11

use of CR has been the subject of repeated criticism. [1]

12
13

In fact, the Department of justice's own Inspector General found in 2013 that "the

14

existing BOP compassionate release program is poorly managed, and that its inconsistent

15

and *ad hoc* implementation has likely resulted in potentially eligible inmates not being

16

considered for release, and terminally ill inmates dying before their requests for

17
18

compassionate release were decided. . . ."  U.S. Dept of Justice, Office of Inspector General,

19

Evaluations and Inspections Division.  It was dissatisfaction with BOP's interpretation and

20

administration of its CR program that led to the reforms contained in the "First Step Act."

21

See e.g. Erica Zunkel, 18 U.S.C. §3553(a)'s *Undervalued Sentencing Command: Providing a*

22
23

*Federal Criminal Defendant with Rehabilitation, Training and Treatment in "the Most*

24

*Effective manner."* Notre Dame Journal of International Law 49, 61 (2019).

25
26
27
28

---

[1]   See e.g. Bryant S. Green, "As the Pendulum Swings: the Reformation of Compassionate Release to
      Accommodate Changing Perceptions of Corrections, 46 U Tol. L. Rev. 123. Casey N. Ferri, "A Stuck Safety
      Valve: The Inadequacy of Compassionate Release for elderly Inmates". Stetson L. Rev. 197, 219-25 (2013)

MOTION FOR COMPASSIONATE RELEASE -- 3

NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA 98004-4376
206-621-0500 fax: 206-400-7636

The "First Step Act" aims to increase the use and transparency of compassionate release by broadening eligibility and removing sole discretion for determining who is eligible for compassionate release from BOP.  For present purposes, the most important reform is that the BOP no longer retains its monopoly on §3582(c)(1)(A) release motions. Rather, federal prisoners for whom the BOP has refused to file such a motion, may now file their own §3582(c)(1)(A) motions with the original sentencing court.

The Sentencing Commission Policy statement on reductions of sentence under 18 U.S.C. §3582(c)(1)(A) – USSG §1B1.13 (p.s.) - lists three specific categories of "extraordinary and compelling reasons" but makes clear that there is no restrictive list of what combination of factors can warrant release. USSG §1B1.13 (p. s.),  comment (n-1(A)-(D).[2]

**PETITIONER PRESENTS "EXTRAORDINARY AND COMPELLING REASONS WARRANTING A REDUCTION IN SENTENCE UNDER 18 USC §3582(c)(1)(A)**

This motion addresses the COVID-19 outbreak in the United State, and particularly in the Federal Prison System.  The Bureau of Prisons has acknowledged that all 118 federal facilities have become infected with COVID -19.  Jane Johnston in an Article published August 2020 places the number of federal inmates infected  as 102,000 out of a total number of 146, 000, i.e. 70% of all federal inmates.  **Exhibit A.**  The  Bloomberg School of

---

[2] **COVID-19 Home Confinement Information**

Given the surge in positive cases at select sites and in response to the Attorney General Barr's directives, the BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement. Since the release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020 instructing us to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed **7,559** inmates on home confinement.

MOTION FOR COMPASSIONATE RELEASE -- 4

NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA 98004-4376
206-621-0500 fax: 206-400-7636

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Public Heath report that there have been 510 deaths in U.S. prisons from COVID -19 as of July 8, 2020. **Exhibit B**. It is reported that 100 of the 510 deaths involved inmates in Federal Custody. The BOP has responded in part to this overwhelming rate of infection by sending 7,559 inmates to home detention.

Mr. Hall was originally serving his sentence at Taft Correctional Institution in California from May 2019 to April 2020. When Mr. Hall was transferred to his current location at C.I. North Lake, Taft had no known COVID- 19 cases, however, within three weeks of arriving at North Lake, Mr. Hall became severely infected with the COVID virus. **Exhibit C.** For a further three weeks petitioner struggled to combat the infection, and recover from the debilitating symptoms which included shortness of breath, high temperature, nausea, headache and fatigue.

Although three months have passed since petitioner contracted the virus, he has still not made a full recovery, and is experiencing shortness of breath, headaches, perpetual exhaustion, above-normal blood pressure, *viz* 148/98, racing pulse 120/minute, loss of taste and smell, loss of sleep and an intermittent tingling in his hands a feet. None of these symptoms are receiving any treatment, and thus cannot be medically documented through the North Creek infirmary.

Mr. Hall's inability to recover from COVID-19 - and current poor state of health - makes him especially vulnerable to a second infection. At the time of filing, scientists have discovered a number of confirmed second infections including a man in Reno, Nevada, see **Exhibit D** and **Exhibit E,** *"13 USS Roosevelt Sailors Test Positive for COVID -19 again."*



THE
NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA 98004-4376
206-621-0500 fax: 206-400-7636

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Accordingly, the inability of the BOP to protect 70% of their inmates including Mr.

Hall, is a strong indicator that Mr. Hall is susceptible to being reinfected.

Many courts have found extraordinary and compelling reasons for granting

compassionate release, even from facilities that have no reported cases. *United States v*

*Deucht,* Case No. 11-cr-60025, Dkt. No. 53 (S.D. Fla. May 28, 2020) (granting compassionate

release despite no confirmed cases at FCI Jessop because "zero confirmed cases is not the

same thing as zero COVID-19 cases" (citation omitted); *United States v Atkinson*, No 2:19-

cr-55 JCM (CWH), 2020 WL 1904585, **2-4 (D Nev. Apr. 17, 2020) granting compassionate

release to defendant Atkinson, notwithstanding that FCP Atwater where he was housed

had seen no cases of COVID-19 because the realities of prison life make it impossible for

medically vulnerable inmates like Mr. Atkinson to follow CDC guidelines to protect

themselves in the face of COVID-19; *United States v Amatrrat,* 2020 WL 2220008 (E.D.

Mich. May 7, 2020) (releasing medically vulnerable inmate from FCI Loretto, despite no

reported COVID-19 cases at the facility, because he could not adequately protect himself in

line with CDC guideline); *United States v Ben-Yhwi*, No. CR 15-00830 LEK, 2020 WL 1874125

(D. Haw. Apr. 13, 2020); *United States v Asarc*, No. 17-CR-127 (ARR), 2020, WL 1899221

(E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is

conducting, it is possible that undetected cases are present in the facility"); *United States v*

*Burrill,* No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Prison

conditions mean incarcerated individuals, as well as society as a whole, are safer the more

defendants are released"; see also *United States v Martin,* 2:08-CR-00244-RS.L.-9, (2020

W.D. Wash. Seattle, Aug. 3. 2020) the court found  "given defendants underlying health

MOTION FOR COMPASSIONATE RELEASE -- 6

conditions, and his current symptoms, the Court finds defendant has met his burden to

establish that "extraordinary and compelling" reasons warrant his compassionate release.

18 U.S.C. §3582(c)(1)(A).

### DEFENDANT'S HEALTH IS AT EXTREME RISK

Mr. Hall's medical records show he has suffered, and is continuing to suffer, from

labile hypertension, chest pain, numbness in arms and legs, and sleep apnea, see **Exhibit C.**

The BOP response to his BP-9, ignored his positive COVID-19 test, ignored his history of

hypertension, ignored the continuing effects of his infection, and ignored the danger of Mr.

Hall being infected a second time. In *United State v. Carter*, Case 1:16-cr-00156-TSC Dkt. 48

Filed 06/10/20, Judge Chutkan from the D.C. District Court wrote:

"The government contends that because Carter has contracted COVID-19 and seemingly

recovered, his motion is moot (ECF No.  45). The government concedes, however, that

scientific authorities are uncertain about whether a person can contract COVID-19 more

than once. See id at n.1. Given the uncertainty, the Court will not reject Carter's motion on

this basis."

Moreover, the BOP has failed to take measures to prevent Mr. Hall from being

infected a second time, by failing to address a highly critical vector for spreading COVID-19:

aerosol transmission. The scientific consensus is now that the virus principally spreads

through aerosol transmission. Aerosols are tiny – measured in microns, or one one-

millionth of a meter - are so tiny that any moisture evaporates while they are floating in the

air.  The particles float on air currents and can take hours for them to settle.  In short,

aerosols can travel long distances on air currents, accumulate, and remain infectious for

MOTION FOR COMPASSIONATE RELEASE -- 7

T H E
**NAHAJSKI FIRM**
601 – 108th Ave NE, Suite 1900
Bellevue, WA 98004-4376
206-621-0500 fax: 206-400-7636

hours.

Handwashing and disinfecting surfaces do not prevent aerosol transmission, nor do "social distancing" procedures.  Furthermore, studies now show that "in an enclosed room with asymptomatic individuals, infectious aerosol concentration can increase over time." Overall, the probability of becoming infected indoors will depend on the total amount of SARS-CoV-2 inhaled.  Ultimately, the amount of ventilation, number of people, how long one visits an indoor facility, and activities that affect air flow will all modulate viral transmission pathways and exposure. Airborne transmission could account, in part, for the high secondary transmission rates to at C.I. North Lake, where, as at nearly all the BOP facilities, the BOP has decided to lock everyone up in their two-person cells for most of the day.

This has been going on for months now. Lockdowns have been imposed randomly, and upon being lifted, are soon re-imposed. However, nothing has been done to curtail or abate the movement of this airborne virus through the institution's air treatment systems.

Whether through indifference or incompetence, the Federal Bureau of Prisons is endangering the life of Mr. Hall, and the lives of individuals entrusted to its care by failing to establish consistent and effective safeguards to protect them from the coronavirus and by subjecting them to conditions of confinement so harsh that mental and physical health are impaired.  More than ninety federal inmates have already died from COVID-19 and thousands of others have been sickened, yet the Bureau fails to follow the directives of the Attorney General and health authorities to de-densify its facilities in order to allow for safe distance between prisoners and lower staff-to-inmate ratios.  Instead, since March 31, the

MOTION FOR COMPASSIONATE RELEASE -- 8

THE
NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA 98004-4376
206-621-0500 fax: 206-400-7636

Bureau has instituted increasingly draconian lockdown measures, confining pretrial detainees and convicted inmates in small cells for up to twenty-three hours per day, and at times up to seventy-two hours straight; triple-bunking some inmates in two-person cells; sharply curtailing contact with family and friends; cancelling educational and rehabilitative programs; eliminating or reducing needed medical care and providing misinformation that frightens, destabilizes, and demoralizes, including quarantining inmates for transfer to home then revoking the transfers without explanation.

The failure of the BOP to reduce the prison population sufficiently to allow for adequate social distancing and the lack of any meaningful measures to eliminate the aerosol transmissions through the institutions ventilation systems places the defendant in danger of reinfection  that he would not face out of custody.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Shortly after the defendant submitted a Compassionate Release/Reduction in Sentence Request on July 17, 2020, the C.I. North Creek denied Mr. Hall's request for compassionate release. **Exhibit E.**  Pursuant to the First Step Act 2018, Mr. Hall has exhausted his administrative remedies, and is now entitled to bring his own motion before the Court.

## 18 U.S.C. §3553(a) FACTORS AS APPLIED TO PETITIONER NATHAN HALL

While this Court properly considered the §3553(a) factors at the time of Mr. Hall's original sentencing, two of these factors have now changed and carry much more weight than at time of sentencing, namely: (1) "The history and characteristics of defendant, 18 U.S.C. (a)(1), and the need for sentence imposed . . . to provide the defendant . . . with

MOTION FOR COMPASSIONATE RELEASE -- 9

medical care . . . in the most effective manner. [3]  Mr. Hall's "history and characteristics" now include serious and worsening physical condition, as described above, and the Court must now consider the need "to provide [Mr. Hall] with ... medical care [for these conditions] in the most effective manner." 18 U.S.C. §3553(a)(2)(D).

The BOP will likely claim that it is capable of providing adequate medical care and treatment for all Mr. Hall's medical conditions, however, such claims should be viewed carefully, given the lack of protection and treatment petitioner has received in the past six months, and given the problems distinguished commentators have found with the BOP's provision of medical care.

Importantly, though relief is warranted here, even without finding that BOP lacks competent care, Mr. Hall will be eligible to unlimited and unrestricted medical care from the Canadian National Health Service to address the medical problems that have arisen from the effects of contracting COVID -19.  Furthermore, by having this treatment in Canada, Mr. Hall would have the ongoing support of his family, that will assist his treatment and recovery, and would relieve the BOP of this burden.[4]

A reduction of Mr. Hall's sentence to time served would not disserve the factors set out in 18 U.S.C. §3553(a)(2)(A) & (B). Petitioner has served more than five years of a seven-year sentence, specifically more than 85% of his imposed sentence with good time applied.

---

3. See, e.g. Zunkel, supra, Notra Dame Journal of International Law, at 57 ("It has become clear that the BOP is not equipped to provide inmates with some of the most basic treatment and rehabilitative services including effective medical care and mental health care.") & at 59 (" The BOP faces numerous challenges in providing adequate let alone effective, medical care to inmates.")

4    Healthcare in Canada is delivered through provincial and territorial systems of publicly funded health care, informally called "Medicare."

MOTION FOR COMPASSIONATE RELEASE -- 10

THE
NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA  98004-4376
206-621-0500 fax: 206-400-7636

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nor would a reduction in sentence to time served disserve 18 U.S.C. §3553(a)(2), i.e. the need for the sentence imposed "to protect the public from further crimes of the defendant." Mr. Hall's impeccable conduct over the past seven and a half years provides a strong  indication that his risk of re-offense is practically nonexistent.  Furthermore, the Sentencing Commission and Supreme Court say that there is no limit on the information a Court can look at when considering the background and conduct of a person for sentencing – see 18 U.S.C. Sec. 3661, and USSG §181.13 (P.S.), Comment (n-1 (A)-(D).

In *Pepper v United States,* 562 U.S. 476 (2011), the Supreme Court stated that §3661 "makes clear" post-conviction and post sentencing conduct could support a lower sentence at resentencing.  *Id.* at 1236. The Court rejected the sentencing court's decision that it couldn't consider Pepper's post sentencing conduct in prison, saying that "the punishment should fit the offender and not merely the  crime." id at 1240. See also *United States v Salinas-Cortez,* 660 F.3d 695 (3rd Cir. 2011) "Post sentencing conduct is a critical part of a person's history in assessing the likelihood of future criminal behavior.

Notwithstanding the COVID-19 pandemic, and 5779 transfers of inmates to home detention, inmates are still "in custody" of the BOP and can be recalled to prison at any time.  Judicial decisions addressing compassionate release are few and far between due to the small number of CR motions made by the BOP,  however, in 2016 in *United States v DiMasi,* 220 F. supp 3d 173 (D.Mass 2016) when DiMasi had served about 5 years of his 8 year sentence for extortion and related crimes, the BOP moved pursuant to 18 U.S.C. §3582(c)(1)(A) to reduce Di Masi's sentence to time served.

MOTION FOR COMPASSIONATE RELEASE -- 11

The "extraordinary and compelling" reasons cited by the BOP were that as a consequence of radiation treatment, DiMasi suffered from an esophageal narrowing that inhibited his ability to swallow, which required that DiMasi be monitored while eating, and this could be more effectively performed by his family at home, rather than an inmate companion.

The Court also determined that "DiMasi's release would also serve the interest of providing him with the most effective treatment in another way." *Id.* at 77. Moreover, the Court determined that although DiMasi's crimes were serious, the purpose of sentencing would be adequately served by time served (corresponding to five years on the original eight year sentence, i.e. 62.5%), and granted immediate release with a six month period of home confinement, id at 178-179.

In *United States v Martin,* CR-08-244-RSL (W.D. Wash. August 3, 2020),  the Court found "Defendant deserved the sentence the Court imposed in June 2018, but the extraordinary nature of the COVID-19 pandemic has altered life as we know it.  The risks to defendant's life and health now outweigh the punitive benefits that would be gained from keeping him incarcerated at this time. *Cf. United States v. Pippin,* CR16-266-JCC, 2020 WL 2602140, at 3 (W.D. Wash. May 20, 2020). Under these circumstances, the Court concludes that releasing defendant early will not frustrate the objectives of § 3553(a)."

## CONCLUSION

Nathan Hall has served, with good-time, more than 85% of his imposed sentence, and continues to suffer from the debilitating effects of COVID -19 he contracted by the failure of the BOP to protect him from harm, and he remains particularly vulnerable to a

MOTION FOR COMPASSIONATE RELEASE -- 12

second infection. The BOP is not providing him with the medical care he needs, and because of the overpopulation, chronic medical staff shortages, and financial constraints, *see Zinkel* supra n.4, are unlikely to provide adequate care in the eleven months before Mr Hall's release, whereas he can obtain effective medical treatment under the Canadian Health Care System.

When he was sentenced, this Court had no way to know that the conditions of his confinement would include becoming ill from a potentially deadly virus that is now part of a global pandemic, nor did the Court contemplate that Mr. Hall would have to spend months in lockdown and quarantine attempting to recover from COVID-19.

For this, and the other extraordinary and compelling reasons set forth herein, the "First Step Act" has given the Court the ability to intervene by empowering the Court to reduce petitioner's sentence to time served.

Petitioner respectfully prays that the Honorable Court consider and make such an Order.

DATED THIS 16th day of NOVEMBER, 2020.

THE NAHAJSKI FIRM

/s/

Nathan Hall
Defendant

Lennard A. Nahajski
WSBA #22138
601 – 108th Ave NE, Suite 1900
Bellevue, WA  98004-4376
Phone: 206-621-0500
Fax:  206-400-7636
Email: len@nahajski.com

MOTION FOR COMPASSIONATE RELEASE -- 13

THE
NAHAJSKI FIRM
601 – 108th Ave NE, Suite 1900
Bellevue, WA  98004-4376
206-621-0500 fax: 206-400-7636

<u>U.S.A. v. Hall</u>

CR 13-113-RSL

Motion for Compassionate Release

# Exhibit A

**By Jane Johnston, Circle of Blue**

The U.S. prison system has emerged as a center of Covid-19 transmission. Along with other national virus hot spots — meatpacking facilities, farmworker housing, and nursing homes — the outbreaks in jails and detention centers highlight a constellation of disease risks for people on the margins of American society.

"The pandemic has driven home the lessons that how these facilities are designed really matters," Michele Deitch, a distinguished senior lecturer at the LBJ School of Public Affairs at the University of Texas, told Circle of Blue. "The fact that people can't physically separate from each other, the fact that they are so densely populated, the fact that people in custody don't have ready access to hygiene supplies and a supply of water, all of those are things that have contributed to the high, high spread of the disease, the massive spread of disease, and the high numbers of deaths."

As of August 18, according to data collected by the Marshall Project, over 102,000 cases have been confirmed among U.S. prisoners, and just over 22,000 cases among prison staff.

Aside from being densely populated and housing a high number of at-risk people, such as the elderly or those with chronic illnesses, prisons are generally unsanitary. Deitch said that prisoners often lack hygiene necessities like soap or hand sanitizer. Some don't even have consistent access to running water.

"All the recommendations that the experts are telling us on the outside that we need to take are measures that really are not available to people inside," said Deitch, who has spent her career trying to improve conditions for prisoners.

There are many reasons for the spread of Covid-19 in prisons, Deitch explained. Policy decisions, like not releasing medically vulnerable people or transferring people between facilities, contribute to crowding and disease spread. So does the failure to take basic precautions, such as not wearing masks or not quarantining prisoners with confirmed or suspected cases. A federal judge ordered California prison officials in July to dedicate space in each state jail for quarantine.

Keri Blakinger, who covers the U.S. criminal justice system as an investigative reporter for the Marshall Project, knows the difficulty of attributing an illness acquired in prison to a specific cause. With so many risk factors, it's hard to draw a direct line between lack of water access and the spread of the virus.

"If there's any kind of disease outbreak, it's really easy to point to all these other factors that can contribute," Blakinger told Circle of Blue. But that doesn't mean that it's not important to be concerned about water access, sanitation and hygiene (WASH) in prisons, she added.

WASH services have long been a source of health trouble inside prisons, contributing to disease outbreaks. "We can just sort of look at these things and logically understand that they're problematic," Blakinger said. "But the nature of prisons makes it really hard to prove specific examples of causality."

One of the reasons for this is that reports from prisoners of water outages, sewage backups, and other plumbing problems often contradict what administrators say. "It's just really difficult to verify because they're behind prison walls," she said. "It's really hard to get any kind of proof."

1  -  Exhibit A

**Preparing for Simultaneous Hazards**

Chronic problems like infrastructure maintenance in jails tend to be magnified in times of crisis. Hurricane Harvey, in 2017, flooded three state and three federal prisons in Beaumont, Texas. Drinking water was disrupted for days, and some inmates complained
of dehydration

Melissa Surette (Savilonis), adjunct professor at Endicott College and emergency management professional who has spent ten years studying how U.S. prisons respond to disasters, says that such stories indicate a lack of emergency planning. The vast majority of prisons are underprepared for hazards like natural disasters and disease outbreaks, she found. The reason? Correctional facilities are underfunded.

With consistent line-item funding, prisons could fix big issues like staff shortages, purchasing and upgrading equipment, and planning for disasters.

"These are challenges we see across the country with other types of facilities as well, not just prison systems, but it's really critical that we focus our time and effort on funding prison systems so they can plan and prepare for disasters," Surette said. As the country enters peak hurricane season — the Gulf Coast now faces Hurricane Laura, a Category 4 storm — Surette said there are two types of disaster plans that prisons should have in place. One is an operational plan, or what they'll do when the storm strikes. The other is a mitigation plan, which Surette said is critical for identifying risks and developing strategies to address them before the disaster occurs.

Risks could include being located in a flood-prone area or one that is exposed to extreme wind or storm events.

Still, those plans mean nothing if a prison doesn't have the resources or staff to support them.

"So you can have a wonderful plan that details how you're going to respond and recover from an incident," Surette said. "But if you don't have the staff that know what's in the plan, or what to do, or they if they don't have access to it, and then if they don't have the resources to support that plan, that presents a lot of challenges, and you kind of have this cascading effect." Blakinger said the real problem isn't a lack of staff. It's that there are too many prisoners. About 1.5 million people in the U.S. are incarcerated, meaning for every 100,000 Americans, 431 are imprisoned."I think that these sort of really basic maintenance problems are going to exist as long as we are trying to incarcerate this many people," she said. "Mass incarceration is expensive and we don't have money for the upkeep and that shows when it comes to these plumbing issues."

The pandemic could be the nudge that catalyzes difficult debates. Sick prisoners have highlighted the need to re-examine not just operating procedures, but basic assumptions about the U.S. criminal justice system, whether it means providing more funding or locking up fewer people.

"We shouldn't just be Covid-focused," Surette said. "We should be thinking about this from a holistic perspective."

## Jane Johnston

Jane is a summer intern at Circle of Blue writing on domestic and international water issues. Jane also writes The Stream for Circle of Blue. Her work is funded through the Allen and Helen Hunting Innovation and Research Fund at the Annis Water Resources Institute. She is a recent graduate of Grand Valley State University, where she studied Multimedia Journalism and Women, Gender and Sexuality Studies. During her time at Grand Valley, she was the host of the Community Service Learning Center podcast Be the Change. Currently based in Alma, Michigan,

<u>U.S.A. v. Hall</u>

CR 13-113-RSL

**Motion for Compassionate Release**

# Exhibit B

July 8, 2020

# COVID-19 Cases and Deaths in Federal and State Prisons Significantly Higher Than in U.S. Population

## PRISON COVID-19 CASES FIVE TIMES HIGHER AND PRISON COVID-19 DEATH RATE THREE TIMES HIGHER THAN GENERAL POPULATION

A new analysis led by researchers at Johns Hopkins Bloomberg School of Public Health found that the number of U.S. prison residents who tested positive for COVID-19 was 5.5 times higher than the general U.S. population, with a prisoner case rate of 3,251 per 100,000 residents as compared to 587 cases per 100,000 in the general population.

The researchers also found the death rate of U.S. prisoners was 39 deaths per 100,000 prison residents, higher than that of the U.S. population at 29 deaths per 100,000 people. After adjusting for age and sex differences between the two groups, the death rate would be three times higher for prisoners compared to the general U.S. population.

The findings were published online in a research letter July 8 in *JAMA*.

The study, which analyzed cases and deaths from March 31 to June 6, 2020, found that COVID-19 cases in prisons increased by 8.3 percent per day compared to 3.4 percent in the general population. The analysis includes COVID-19 cases among prisoners, including active confirmed cases, recoveries, and decedents, posted on publicly available data sources such as correction departments' websites, news reports, and press releases.

"While these numbers are striking, we actually think the disparities within prisons is much greater," says lead author Brendan Saloner, PhD, associate professor in the Department of Health Policy and Management at the Bloomberg School. "Some prisons are not reporting any cases, others are not even testing inmates, so the need for policies to protect incarcerated populations is

more important than ever."

For the study, the Bloomberg School researchers collaborated with the UCLA Law COVID-19 Behind Bars Data Project, a new initiative based at the University of California, Los Angeles—led by senior author, Sharon Dolovich, JD, PhD, at the University of California, Los Angeles School of Law—that collects data on prisoners in state and federal prisons.

For their analysis of COVID-19 deaths, the researchers drew from information available from departments of corrections and external medical examiner reports. Using data from the Centers for Disease Control and Prevention and the U.S. Census Bureau's American Community Survey, the researchers were able to gather state-level data about COVID-19 cases, deaths, and demographics for the general U.S. population.

The researchers counted COVID-19 cases and deaths separately for prisoners and the general population. During the study period, there were 42,107 cases of COVID-19 and 510 deaths among 1,295,285 prison residents. Among the U.S. population, there were 1,920,904 infections and 95,608 deaths.

Prison populations are especially vulnerable to the spread of a highly infectious disease like COVID-19. Close confinement, limited access to personal protective equipment, and high rates of preexisting respiratory and cardiac conditions are factors that can exacerbate the spread of COVID-19 among the two-plus million people incarcerated in America's jails, prisons, and correctional facilities. Policies that have potential to curb the spread of disease include the early release of prisoners unlikely to pose a risk of reoffending, implementing strong infection control practices, and using widespread testing.

"Prisoners have a right to adequate protection of their health while incarcerated," says Saloner. "The reality of these findings shows that we aren't coming anywhere close to meeting their basic needs. Ultimately, it creates a dangerous situation for the inmates, prison staff, the communities that prisons are located in, and in our overall effort to contain the crisis."

"COVID-19 Cases and Deaths In Federal and State Prisons" was written by Brendan Saloner, Kalind Parish, Julie A. Ward, Grace DiLaura, and Sharon Dolovich.

<u>U.S.A. v. Hall</u>

CR 13-113-RSL

**Motion for Compassionate Release**

# Exhibit C

 SPECTRUM HEALTH

# FINAL REPORT

| | | | | |
|---|---|---|---|---|
| **D O C T O R** | MOODY, TRACY<br>eSHare \| MINL \| NORTH LAKE CORR FACILITY<br>1805 WEST 32ND STREET<br><br>BALDWIN , MI 49304<br>Acct #:<br><br>NPI: 1578713798 | **P A T I E N T** | HALL, NATHAN<br><br>DOB:8/1/1997<br>SEX:M                AGE: 23<br>U/FL:BOP          WING: B-2-2<br>ROOM:207-L       BED: L<br>ID:  3176290    ALT ID: 48817-086 | **S A M P L E** | Specimen ID: 20129LCL00389<br><br>Report Date: 5/9/2020 11:04<br>Date Received: 5/9/2020 11:10<br>Date Observed:5/8/2020 12:30 |

**NOTES:**

## CLINICAL INFORMATION

**FASTING:**                  **Total Volume:**                        **Source:**

## CLINICAL REPORT

### Clinical Abnormalities Summary:   (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| COVID19 PCR | Detected A | | | | |
|---|---|---|---|---|---|

### COVID-19 PCR

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| COVID19 PCR | | Detected A | Not Detected | | | |
| | Positive for 2019 Novel Coronavirus RNA. | | | | | |
| | Positive results are indicative of the presence of SARS-CoV-2 RNA; clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status. Positive results do not rule out bacterial infection or co-infection with other viruses. The performance of this test has not been evaluated for asymptomatic patients by the FDA. | | | | | |
| | Testing was performed using a nucleic acid amplification method. Lower limit of detection is less than 5 virus copies/ul. Emergency Use Authorization (EUA) is needed at this time as no-FDA-approved tests that identify the presence of the 2019 novel coronavirus in clinical specimens are available in the United States. See http://lab.spectrumhealth.org for additional information. | | | | | |
| COVID-19 RESULT COMMENT | See Comment | | | | | |
| | If the COVID-19 result states "detected", "inconclusive" or "invalid" and you have not already been contacted by a medical professional from Spectrum Health about your result, please call the Laboratory Call Center(open 24 hours a day) at 616.774.7721 before going out in the community. | | | | | |
| Performing Lab | . | | | | | |
| | ADVANCED TECHNOLOGY LABORATORIES, 145 MICHIGAN NE, GRAND RAPIDS MI49503. Medical Director: William Chopp, MD, (616) 774-7721 | | | | | |

## PERFORMING LAB

' , , , , , , ,

L = BELOW LOW NORMAL  \|  LL = ALERT LOW  \|  H = ABOVE HIGH NORMAL  \|  HH = ALERT HIGH  \| < = PANIC LOW  \| > = PANIC HIGH \| A = ABNORMAL \| AA = CRITICAL ABNORMAL \| S = SUSCEPTIBLE \| R = RESISTANT \| I = INTERMEDIATE \| NEG = NEGATIVE \| POS = POSITIVE

North Lake Correctional Facility



# REQUEST FOR HEALTH SERVICES
## SOLICITUD PARA SERVICIOS MEDICOS

☐ Psychological Complaint
Queja Psicológica

☒ Medical Complaint
Queja Médica

☐ Dental Complaint
Queja Dental

Print: _Nathan Hall_
Inmate/Detainee/Resident's (I/D/R) Name
Nombre de Identificación

_48817686_
Number
Numero

_BC 203_
Housing Location
Lugar de Vivienda

_DIA_
Duty Hours
Horas de Trabajo

Briefly state the reason for your request; you will receive a response to your request. Please allow several days for your request to be submitted, answered, and returned. A copy of your request will be filed in your medical record.

Explique brevemente la razón de su solicitud; recibirá respuesta a su solicitud. Por favor permita varios días para que su solicitud sea procesada. Una copia de su solicitud será archivada en su récord médico.

PROBLEM/QUEJA: _My heart has been racing I've been Sweating Coughing and Having Body aches, and Problems Breathing its Been over 7 days of this I Need to See the Doctor ASAP!_

_Temp 96.7_

_____
I/D/R's Signature/Firma

_May 7th 2020_
Date of Request / Fecha de Solicitud

→ STAFF ONLY - DO NOT WRITE BELOW THIS LINE/EMPLEADOS SOLAMENTE - NO ESCRIBA DEBAJO DE ESTA LINEA ←

Date/Time Received: _5-7-2020_   _1805_
Date/Time Triaged: _5-8-2020_   _1100_

☒ ROUTINE
☐ URGENT **

☒ Written Response (see below)   ☒ Referred To: _Nursing_   ☐ Appointment Made

Triage Nurse: (Signature/Title Stamp) _S. Baldwin RN_
S. Baldwin, RN
NLCE

ACTION TAKEN: _Sent to medical on ~~4-8-2020 1810~~ 5-8-2020._

_D. Strelow LPN_
Medical Staff Signature/Stamp

D. Strelow, LPN
NLCE
Date

**Patient ALLERGIC to:**
_NKDA_

Rev 2/11, 6/11, 1/13, 1/15, 6/17

HS-154 (Dual)



# REQUEST FOR HEALTH SERVICES
## SOLICITUD PARA SERVICIOS MEDICOS

☐ **Psychological Complaint**
Queja Psicológica

☑ **Medical Complaint**
Queja Medica

☐ **Dental Complaint**
Queja Dental

Print: _Nathan Hall_
Inmate/Detainee/Resident's (I/D/R) Name
Nombre de Identificación

_4887086_
Number
Numero

_BB_
Housing Location
Lugar de Vivienda

_746 am_
Duty Hours
Horas de Trabajo

Briefly state the reason for your request; you will receive a response to your request.  Please allow several days for your request to be submitted, answered, and returned. A copy of your request will be filed in your medical record.

Explique brevemente la razón de su solicitud; recibirá respuesta a su solicitud. Por favor permita varios días para que su solicitud sea procesada. Una copia de su solicitud será archivada en su récord médico.

PROBLEM/QUEJA: _Pounding heart, tingling in my feet and tightness in Chest on left side; numbness in leg (its Been about 4 Days)_

_[signature]_
I/D/R's Signature/Firma

_28th of May 2020_
Date of Request / Fecha de Solicitud

➤ STAFF ONLY - DO NOT WRITE BELOW THIS LINE/EMPLEADOS SOLAMENTE - NO ESCRIBA DEBAJO DE ESTA LINEA ◄

Date/Time Received: _5/28/2020 0745_

Date/Time Triaged: _5/28/2020 0745_

☑ **ROUTINE**
☐ **URGENT **

☐ Written Response (see below)   ☐ Referred To: _____   ☑ Appointment Made

Triage Nurse: (Signature/Title Stamp) _K Robinson RN_

K. Robinson, RN
NLCF

ACTION TAKEN: _Same day appt_

_[signature] M Hemmer RN_
Medical Staff Signature/Stamp

M. Hemmer, RN
NLCF

_5/28/20_
Date

## SOAPE/Narrative Note

**Encounter Type:**
☑ Face to Face

**Person Completing Note:**
☑ Mental Health

**Type of Note:**
☑ SOAPE

### SOAPE

**Subjective:**

42 y/o separated father of 3 from British Columbia. Arrested in 2015 sentenced to 84 mos for conspiracy. He has completed grade 10.

Lost weight and strength during COVID down time

Trauma in Life:

Raised by mom dad by age 7 all kinds of abuse mental, physical, sexual. Social services took him out of the house, half sister told about her sexual abuse. Foster care, then group home becuase mom would not let foster care parents adopt him. After 2 years back with Mom lots more violence, then got into crime, high speed chases, chewed on by police dogs, gang life, shootings killings my life turned into a shit show.

Spiritual based energy and it just goes somewhere else when you die. I understand the purpose of religion but I know if I want something done I got to do it myself.

Who are you?: A wise man for my age man trying to get his life back together to try to get away from this prison lifestyle bullshit. Try to be a good person and help people out now.

What is your purpose in life?: Hmmm got three kids maybe to educate them and keep them away from the lifestyle. middle from a different woman 20 y/o doing OK

**Assessment:**

Lots of MDA and Ecstasy other drugs growing up. Lots of counseling on the streets. Never on Medication. Diagnosed with COVID about a month ago. Since then racing heart, feels pulse in finger tips/feet, pain in legs.

**Plan:**

Exercise strenuously

Keep writing book/journaling

Continue watching diet (cutting salt out)

Stay in touch with kids

Meet in 2 weeks to see number of duration of episodes.

**Objective:**

Has had decreasing heart palpitations - pain in leg upper thigh questions if there could be a clot — maybe simply symptom carry over from COVID - now pain in Armpit

**Did patient refuse vitals:**
NO ANSWER PROVIDED

**Assessment:**

Making progress.

Less heart palpitations decreased anxiety (minimal)

**Plan:**

Continue stringent exercise, diet (up to 268 lbs)

Follow up again in 2 weeks

---

**SOAPE/Narrative Note**
SOAPE and Narrative note for Medical Providers or Nurses

Patient Name: HALL, NATHAN
Patient Number: 48817-086
Location: BOP-B-2-2-207-L-L
DOB: 8/1/1997
Facility: NORTH LAKE CORR FACILITY
Electronically Signed By MOORHEAD, DOUGLAS on 06/17/2020 08:09:44

HALL, NATHAN #48817-086
**DOB**: 8/1/1997 (23y) **Location**: BOP-B-2-2-207-L-L

# Have you traveled from

## Medical Screening Have you traveled from, or through, any of the locations identified by the CDC as increasing epidemiologic risk within the last 14 days:

Yes
**Last date of travel:**
03/31/2020
**Had close contact with anyone diagnosed (laboratory-confirmed) with COVID-19 illness within the last 14 days:**
No
**Did patient refuse vitals:**
No vitals Refused

## Vital Signs
**Temperature:** 97.1
**Blood Pressure:** 147/98
**Height:**
6-1
**O2 Sat:**
**Pulse Rate:** 64
**Weight:**
271
**Respiratory Rate:**
16
**Does the I/D/R report past positive TB result (taken within previous 12 months):**
No
**Does patient need TB plant and read and/or Chest X-Ray per policy:**
No TB Plant/Read or Chest X-Ray needed at this time
**How do you feel today:**
"I'm alright"
**How do you feel about being incarcerated:**
"It sucks" **Have you fainted recently or have you ever had a head injury with loss of consciousness:**
No **Are you now or have you been treated by a doctor within the last 5 years for a medical condition, including hospitalization:**
No
**What surgeries have you had:** Broken femur: titanium rod in 2001 MVA

**Do you have a history of or current communicable illness:**

**Intake Screening and Education - HS-168 - HS-143 Intake screening for new arrivals**

**Patient Name: HALL, NATHAN** Patient Number: 48817-086 Location: BOP-B-2-2-207-L-L

DOB: 8/1/1997 Facility: NORTH LAKE CORR FACILITY **Electronically signed By**

ROBINSON, KATIE on 04/01/2020 00:05:05

2 of 6

**LL, NATHAN #48817-086**
**DOB**: 8/1/1997 (23) **Location**: BOP-B-2-2-207-L-L
SOAPE/Narrative Note
**Encounter Type:**
Face to Face
**Person Completing Note:**
**Nurse**
**Type of Note:**
SOAPE

## SOAPE **Subjective:**

"pounding heart, tingling in my feet, tightness in chest on left side, numbness in leg. It's been about 4 **days". Inmate reported that he started blood pressure medication treat**ment prior to COVID virus.

**Objective: assessme**nt done for sickcall

**Did patient refuse vitals:**
Some vitals refused
**Blood Pressure: 134/96**
**Temperature:** 97.2
**Pulse Ox**
100
**Pulse: 69**
**Weight:** *NO ANSWER PROVIDED*
**Pain Scale:** *NO ANSWER PROVIDED*
**Respiratory Rate:**
**18**
**Reason for refusing vitals:**
**scale unavailable**
**Assessment:**
**elevated blood pressure. anx**iety due to virus. MLP notified.
**Plan:**
continue to monitor, **referred also t**o Mental Health
**Education**:
importance of a low sodium diet (which inmate had already activated himself x 1 week).
Elimination of caffeine (which inmate has activated himself **x 1 week).**
**Interpreter Needed:** *NO ANSWER PROVIDED*
**SOAPE/Narrative Note** SOAPE and **Narrative note for Medical Providers or Nurses**
**Patient Name**: HALL, NATHAN **Patient Number: 48817-086 Location: BOP**-B-2-2-207-
L-L **DoB: 8/1/1997 Facility**: NORTH LAKE CORR FACILITY **Electronically signed By**

**HALL, NATHAN  #48817-086**                    **DOB:** 8/1/1997 (23y)   **Location:** BOP-B-2-2-207-L-L

## SOAPE/Narrative Note

**Person Completing Note:**
☑ Nurse

**Type of Note:**
☑ SOAPE

### SOAPE

**Subjective:**

Encounter Time:  1230  " I  had a fever for several days and I am sweating at night"

**Objective:**

Patient is alert and oriented to person, place, time and situation. Gait is steady. Respirations are regular, unlabored with no SOB noted. Lungs are CTA. No distressed noted. Patient denies pain, dizziness, denies chest pain. Voices no other complaints at this time. Patient will be in medical for observation. patient ambulated to his medical room without difficulty.

**Did patient refuse vitals:**
☑ No vitals refused

| Blood Pressure: | Temperature: | Pulse Ox |
|---|---|---|
| 129/82 | 97.8 | 98 |
| **Pulse:** | **Weight:** | **Pain Scale:** |
| 105 | 250 | ☑ 0 |
| **Respiratory Rate:** | | |
| 18 | | |

**Assessment:**

Potential for alterations in Body system due to COVID-19 exposure.  Health Maintenance:  Patient swabbed for COVID-19 today.

**Plan:**

1. Encourage fluids

2. Swabbed for COVID-19 and sent to LAB

3. teach deep breathing and good hand hygiene

4. patient has access to 24/7 health care

5. Patient will be monitored in medical for elevated temp or decrease in SA02

6. patient instructed to ambulate out of bed often and around his room.

**Education:**

1. Practice good hand hygiene

.2. Cover mouth when coughing and sneezing, wash hands immediately

3. Ambulate often

4. Deep breath often

---

**SOAPE/Narrative Note**
SOAPE and Narrative note for Medical Providers or Nurses

Patient Name: HALL, NATHAN
Patient Number: 48817-086
Location: BOP-B-2-2-207-L-L
DOB: 8/1/1997
Facility: NORTH LAKE CORR FACILITY
Electronically Signed By MOORE, LISA on 05/08/2020 13:34:29

<u>U.S.A. v. Hall</u>

CR 13-113-RSL

**Motion for Compassionate Release**

# Exhibit D

# Scientists are reporting several cases of Covid-19 reinfection — but the implications are complicated

BY ANDREW JOSEPH **@DREWQJOSEPH**

AUGUST 28, 2020

Reprints



Following the news this week of what appears to have been the first confirmed

case of a Covid-19 reinfection, other researchers have been coming forward with their own reports. One in Belgium, another in the Netherlands. And now, one in Nevada.

What caught experts' attention about the case of the 25-year-old Reno man was not that he appears to have contracted SARS-CoV-2 (the name of the virus that causes Covid-19) a second time. Rather, it's that his second bout was more serious than his first.

Immunologists had expected that if the immune response generated after an initial infection could not prevent a second case, then it should at least stave off more severe

illness. That's what occurred with the first known reinfection case, in a 33-year-old Hong Kong man.

Still, despite what happened to the man in Nevada, researchers are stressing this is not a sky-is-falling situation or one that should result in firm conclusions. They always presumed people would become vulnerable to Covid-19 again some time after recovering from an initial case, based on how our immune systems respond to other respiratory viruses, including other coronaviruses. It's possible that these early cases of reinfection are outliers and have features that won't apply to the tens of millions of other people who have already shaken off Covid-19.

"There are millions and millions of cases," said Michael Mina, an epidemiologist at Harvard's T.H. Chan School of Public Health. The real question that should get the most focus, Mina said, is, "What happens to most people?"

But with more reinfection reports likely to make it into the scientific literature soon, and from there into the mainstream press, here are some things to look for in assessing them.

**What's the deal with the Nevada case?** The Reno resident in question first tested positive for SARS-CoV-2 in April after coming down with a sore throat, cough, and headache, as well as nausea and diarrhea. He got better over time and later tested negative twice.

But then, some 48 days later, the man started experiencing headaches, cough, and other symptoms again. Eventually, he became so sick that he had to be hospitalized and was found to have pneumonia.

Researchers sequenced virus samples from both of his infections and found they were different, providing evidence that this was a new infection distinct from the first.

Researchers are finding that, generally, people who get Covid-19 develop a healthy immune response replete with both antibodies (molecules that can block pathogens from infecting cells) and T cells (which help wipe out the virus). This is what happens after other viral infections.In addition to fending off the virus the first time, that immune response also creates memories of the virus, should it try to invade a second time. It's thought, then, that people who recover from Covid-19 will typically be protected from

another case for some amount of time. With other coronaviruses, protection is thought to last for perhaps a little less than a year to about three years.

But researchers can't tell how long immunity will last with a new pathogen (like SARS-CoV-2) until people start getting reinfected. They also don't know exactly what mechanisms provide protection against Covid-19, nor do they know what levels of antibodies or T cells are required to signal that someone is protected through a blood test.

## Fear, dread, and panic: Some Covid-19 survivors feel stalked by possibility of reinfection.

### What happens when people broadly become susceptible again?

Whether it's six months after the first infection or nine months or a year or longer, at some point, protection for most people who recover from Covid-19 is expected to wane. And without the arrival of a vaccine and broad uptake of it, that could change the dynamics of local outbreaks.

In some communities, it's thought that more than 20% of residents have experienced an initial Covid-19 case, and are thus theoretically protected from another case for some time. That is still below the point of herd immunity — when enough people are immune that transmission doesn't occur — but still, the fewer vulnerable people there are, the less likely spread is to occur.

On the flip side though, if more people become susceptible to the virus again, that could increase the risk of transmission. Modelers are starting to factor that possibility into their forecasts.

A crucial question for which there is not an answer yet is whether what happened to the man in Reno, where the second case was more severe than the first, remains a rare occurrence, as researchers expect and hope. As the Nevada researchers wrote, "the generalizability of this finding is unknown."

<u>U.S.A. v. Hall</u>

CR 13-113-RSL

**Motion for Compassionate Release**

# Exhibit E

THE COVID-19 CRISIS

# 13 USS Roosevelt Sailors Test Positive For COVID-19, Again

SARAH MCCAMMON

Twitter

Hundreds of crew members from the aircraft carrier USS Theodore Roosevelt, which was docked in Guam in April, have tested positive for COVID-19.

The U.S. Navy says 13 sailors from the USS Theodore Roosevelt who had apparently recovered from COVID-19 and had received negative test results have now tested positive for a second time.

In a statement released earlier on Saturday when five sailors were found to have retested positive, the Navy said the sailors had "met rigorous recovery criteria, exceeding CDC guidelines," including testing negative for the virus at least twice, but have now retested positive. The statement said the sailors had been monitoring their health and adhered to social-distancing protocols while on board the Roosevelt, which has been docked in Guam following an outbreak infecting hundreds of crew members.

"These five Sailors developed influenza-like illness symptoms and did the right thing reporting to medical for evaluation," the statement said.

The Navy has since confirmed to NPR that an additional eight sailors have retested positive for COVID-19, bringing the total to 13.

The Navy said the sailors were removed from the ship and placed in isolation, and are receiving medical care. A "small number" of sailors who had been in contact with them also were removed, retested and quarantined, officials said.

T
SARAH MCCAMMON

Hundreds of crew members from the aircraft carrier USS Theodore Roosevelt, which was docked in Guam in April, have tested positive for COVID-19.

The U.S. Navy says 13 sailors from the USS Theodore Roosevelt who had apparently recovered from COVID-19 and had received negative test results have now tested positive for a second time.

In a statement released earlier on Saturday when five sailors were found to have retested positive, the Navy said the sailors had "met rigorous recovery criteria, exceeding CDC guidelines," including testing negative for the virus at least twice, but have now retested positive. The statement said the sailors had been monitoring their health and adhered to social-distancing protocols while on board the Roosevelt, which has been docked in Guam following an outbreak infecting hundreds of crew members.

"These five Sailors developed influenza-like illness symptoms and did the right thing reporting to medical for evaluation," the statement said.The Navy has since confirmed to NPR that an additional eight sailors have retested positive for COVID-19, bringing the total to 13.

<u>U.S.A. v. Hall</u>

CR 13-113-RSL


Motion for Compassionate Release


# Exhibit F



Inmate or Inmate's Legal Counsel
<u>Hall, Nathan</u>
<u>#48817-086</u>

Re:   Letter of Request for Consideration of Compassionate Release for
<u>Hall, Nathan</u>

Mr. Hall, Nathan,

I write in response to the Compassionate Release/Reduction in Sentence Request
dated July 13, 2020. Received on July 17, 2020 A review of the request has been
completed pursuant to Bureau of Prisons Program Statement 5050.50 dated
January 17, 2019, <u>Compassionate Release/Reduction in Sentence: Procedures for
Implementation of 18 U.S.C §§ 3582 and 4202(g).</u>

After careful review of your request, it appears that you are ineligible based on the
requirements for consideration set forth by the Bureau of Prisons.

**Detainer Status:** ⓨⓔⓢ or No – If an inmate has an ICE Detainer or the Public
Safety Factor of Deportable Alien, the inmate is ineligible for community based
programs to include halfway house, home confinement, and compassionate
releases; however, if a decision is made in regards to his deportation status and he
is determined to be not deportable, the inmate becomes eligible for those programs.
ICE lodged 6/16/20 & PSF of Deportable Alien
The following section would need to be filled out on all eligible cases:

- ***Twelve (12) month institutional history***
  None

- ***Verifiable release plan***
  Not provided with request

- ***Offense History***
  3/2019 – code 296